**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSEPH JOHN OKA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 23 C 15793** |
| | ) | |
| **UNITED AIRLINES, INC. &** | ) | |
| **AIR LINE PILOTS ASSOCIATION,** | ) | |
| **INTERNATIONAL,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Joseph Oka is a pilot employed by United Airlines, Inc. and a member of the Air Line Pilots Association, International (ALPA), a labor union representing pilots. In August 2021, United implemented a mandate requiring its employees to obtain a vaccination against COVID-19, subject to religious and medical exemptions. Oka received a religious exemption and was put on unpaid leave without benefits.

Oka sued United and ALPA under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, alleging that each discriminated against him on the basis of religion. At this stage, Oka has three remaining sets of claims: (1) a failure-to-accommodate claim against United, (2) a disparate treatment claim against United, and (3) a disparate treatment claim against ALPA.

United and ALPA have filed motions for summary judgment on Oka's remaining claims. For the reasons below, the Court grants both motions.

**Background**

United is one of the world's largest airlines. ALPA is the largest pilots' union in the world. At all relevant times, United and ALPA had a collective bargaining agreement—the United Pilot Agreement (UPA)—which established the terms and conditions of ALPA-represented pilots employed by United, including Oka. The United Pilots Master Executive Council (MEC) is ALPA's highest local coordinating body for those pilots.

**A.      United's vaccination mandate**

On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. On March 13, the President Donald Trump declared the outbreak of COVID a national emergency. In response, United and ALPA negotiated a memorandum of understanding (MOU 20-01), which was ratified three days later. As relevant here, MOU 20-01 provided pay protection for pilots required to quarantine due to sickness, the sickness of a relative, or direction by a government or medical official.

In January 2021, in response to public remarks by United about mandating vaccination against COVID, ALPA issued a communication to its pilots addressing the possibility. ALPA stated that "[m]andating an approved vaccine would be contractually permissible [under the UPA] and generally allowable under federal law." ALPA App'x at 860–63.[1]

In the spring of 2021, United informed ALPA that it planned to require vaccination. After negotiations, United and ALPA executed a letter of agreement in May

---

[1] The parties use consecutive pagination in the appendices regarding ALPA's motion. They organize by exhibit instead, largely without pagination, for United's motion. The Court follows the same convention.

2021 (LOA 21-02), which prevented United from imposing a vaccine mandate, in exchange for COVID protocols incentivizing vaccination and restricting which flights unvaccinated pilots could be on.  LOA 21-02 expressly provided that United could terminate the agreement with thirty days' notice.

On June 4, ALPA sent a written message to its pilots regarding the negotiations and agreement.  The message stated that:

> Throughout the pandemic, United management has been vocal about the possibility of instituting a vaccine mandate.  In early May, management came to ALPA expressing their belief that many foreign countries might start requiring a COVID vaccination to enter the country, even for flight crews.  If this occurred, management believed they would either need to immediately mandate the vaccine for all flight crews or be prepared to drastically cut United's international schedule.  They made it clear that reducing our international reach was not a viable option and concluded a vaccine mandate was their best path forward.
>
> ALPA supports the vaccine and the science behind it.  However, we believe incentives and education should be exhausted well before any move to mandate the vaccine.  Over the course of the month, we repeatedly advocated that vaccines remain a choice and tested the Company's assumptions.  With only a few days to go before management mandated the COVID vaccine, we reached agreement on LOA 21-02 to forestall the mandate and instead incentivize the vaccine with add [sic] pay and route restrictions.

ALPA App'x at 870.  In the message, ALPA also reiterated its belief that a vaccination mandate would be legal:

> The EEOC has clearly stated that employers may legally require the COVID vaccine as a matter of public health and safety . . . .  We enlisted the help of a team of legal experts within ALPA as well as three outside law firms to assess our strategy and options for dealing with an imminent mandate from United management.  All legal counsel has agreed that an employer mandate would likely be determined to be lawful.  This was an important part of our calculation on how to proceed.

*Id.*

On August 6, 2021, United announced that it would require its employees to be

3

vaccinated by September 27 of that year.  On August 12, 2021, ALPA issued a statement saying that reasonable accommodation requests were outside its representational scope.  On September 8, 2021, United representatives informed three ALPA representatives—attorneys Nathan Eisenberg and John Schleder and Negotiating Committee member Jeff Brown—that United would offer personal leaves of absence to pilots with accepted religious objections to the mandate and medical leaves of absence to pilots with accepted medical objections to the mandate.

Over the next few days, Brad Hunnewell—a member of the MEC Contract Interpretation & Administration Committee—emailed Sarah Nau, United's Director of Labor Relations, about the personal leave that would be offered for those with religious accommodations.  He raised two concerns.  First, he pointed out that United's religious accommodation announcement stated that the maximum duration of leave was six years, instead of the five provided in the UPA.  Second, Hunnewell pushed for fixed end-dates, subject to renewal or early returns with United's approval, to avoid complications with recall priority in the event of a furlough.

Hunnewell also raised an issue regarding medical accommodations:  "[I]t seems odd to put a pilot on medical leave while he still has sick bank.  I'm not aware of that ever happening before.  Maybe the pilot should have the option of exhausting [sick time] before going on the medical leave?"  *Id.* at 900.  Nau stated that she was working on the issue.

Indeed, earlier that day, Nau had reached out to Eisenberg and Jeffrey Loesel, another ALPA lawyer, to discuss the same proposal.  She reached out to Eisenberg again shortly after her conversation with Hunnewell.  Two hours later, Eisenberg

emailed Nau saying that ALPA:

> agree[d] that allowing a pilot who was granted a [medical] accommodation . . . to exhaust sick leave prior to being placed on an unpaid [UPA] Section 12-B Medical Leave of Absence is consistent with the provisions of the UPA and practices surrounding them and does not violate the UPA rights of other pilots.

Id. at 904. Eisenberg also stated that ALPA had a limited role regarding accommodations:

> [ALPA]'s role in this matter is limited to determining if proffered accommodations are consistent with the UPA. ALPA does not have any role to determine, and takes no position as to, whether such an accommodation . . . is consistent with the governing discrimination statutes and related regulations.

Id. MEC Chair Todd Insler, MEC Grievance Chair Joseph Pedata, Hunnewell, Loesel, and Schleder were CC'ed on that email.

On September 15, 2021, Eisenberg emailed ALPA-represented pilots to address their inquiries regarding the vaccination mandate. He stated that the mandate was not a violation of the Railway Labor Act and that the personal and medical leaves that United offered were "specifically addressed in Section 12 of the UPA." Id. at 973. Oka read this email and the UPA's personal leave provision, but he did not read the UPA medical leave provision.

On September 27, 2021, United rescinded LOA 21-02 and implemented its vaccination mandate, subject to medical or religious exemptions. Oka requested and received a religious exemption.

United did not permit its pilots to fly its planes without being vaccinated. It instead offered leaves of absence as it had previously communicated to ALPA. Pilots with a religious exemption, like Oka, received personal leave; pilots with medical exemptions received medical leave. Both were unpaid but differed in three ways

5

relevant here.  First, the maximum duration of personal leave was five years; medical leave could last up to six.  Second, pilots retained more insurance and travel benefits on medical leave.  Third, pilots with medical exemptions were permitted to use accrued sick time—during which they would be paid—before starting their unpaid medical leave.

United also offered those with either exemption preferential consideration for non-customer-facing roles at United and waived its ethical prohibition on outside employment.  Oka did not pursue these alternatives.

**B.    Grievances**

United's vaccination mandate prompted grievances.  UPA Section 17 authorizes the MEC Grievance Committee to file a group grievance on behalf of multiple pilots.  It also permits pilots to file grievances on their own.  Those go through several layers of review.  The first two are conducted by United:  the grievance is first submitted to a chief pilot and can be appealed to United's Vice President of Flight Operations.  After that, the MEC Chair and the Grievance Committee (GC) decide whether the grievance should be submitted to an arbitral body called the System Board of Adjustment.  If ALPA decides not to do so, the pilot may appeal that decision to the MEC Grievance Review Panel (GRP).

In September 2021, Oka filed a grievance on behalf of himself and a number of other pilots.  Oka amended the grievance twice by the time it was reviewed, so the Court will refer to it as the second amended grievance (SAG).  The SAG complained primarily that United violated the UPA by imposing a vaccination mandate.  For example, it contended that the mandate "discriminated against pilots who engaged in the protected activity of identifying and revealing faith and medical based objections."

6

*Id.* at 970. It also alleged that United violated the Railway Labor Act's restrictions on how an employer may modify certain working conditions of employees. *See* 45 U.S.C. § 152. The SAG initially did not allude to any disparity between religious and medical accommodations.

United denied the SAG in October 2021 and denied the appeal in January 2022. MEC Chair Insler, GC Chair Pedata, and GC Vice Chair Philip Di Costanzo discussed the SAG and declined to submit it to the System Board. Oka appealed that decision to the GRP, which held a two-day remote hearing on March 2 and 3, 2022. During that hearing, Oka presented a 133-slide Keynote deck (the Apple version of PowerPoint) over the course of approximately five hours. One slide compared medical accommodations to religious accommodations: "Medical RAP have benefits and are treated better than Religious RAP (no benefits)." ALPA App'x at 1140. Eight days later, the GRP issued a written decision denying Oka's appeal, stating that "the Panel ultimately decided that . . . the Company could impose the vaccination requirement under the UPA, and any lawsuit alleging that United violated the [Railway Labor Act] status quo obligation would be baseless." *Id.* at 1004.

ALPA pressed a separate grievance on October 5, 2021 on behalf of pilots who allegedly had not been appropriately paid under LOA 21-02. United agreed to settle that grievance on February 4, 2022 by providing backpay. One of the pilots who received backpay was a religious objector. ALPA also filed several grievances on behalf of pilots disciplined for noncompliance with United's vaccination mandate. Some of these pilots were also religious objectors.

Finally, ALPA filed a grievance on behalf of pilots who United had directed to

quarantine.  ALPA asserted that United was required to provide pay protection under MOU 20-01 instead of using the pilots' sick time.  The System Board disagreed.  One of ALPA's arguments was that United could not require the use of sick time because UPA Section 13-A-5 limits its use to cases of actual sickness, and United had not previously required pilots to use sick time if they were not actually sick.  The System Board rejected that argument.  It reasoned that "[t]he language of Section 13-A-5 simply does not address the quarantine situation.  While Section 13-A-5 does limit use of sick leave to when a Pilot is actually sick, the MOU modifies the provisions of Section 13 with respect to the use of sick leave . . . ."  *Id.* at 925.

On March 11, 2022, United announced that it planned to soon allow employees with exemptions to return to work.  Oka returned to work on March 28, 2022.

**C.    Oka's lawsuit**

On January 28, 2022, Oka filed a charge against United with the Equal Employment Opportunity Commission (EEOC).  The charge stated, in relevant part:

> During my employment, I notified my employer of my religious belief and requested a religious accommodation to Respondents['] Covid-19 vaccination mandate.  My request was approved, however the only accommodation offered to me was an indefinite, unpaid leave of absence with loss of all benefits and flying privileges. On November 12, 2021[,] I was placed on leave.  I believe I have been discriminated against because of my religion.

United App'x, Ex. 2.  On May 18, 2022, Oka filed a charge against ALPA with the EEOC.  It contained significantly more information than the charge against United, including allegations that ALPA "allowed [United] to treat the medical subset more favorably than the religious subset" and that Oka's "religious . . . suspension was materially and disparately worse than those pilots requesting a medical

accommodation."  Oka-United App'x, Ex. 2.[2]

On October 3, 2023, Oka filed a three-count complaint against United and ALPA in the District Court for the Eastern District of Kentucky.  The suit was transferred to this Court, where Oka filed a seven-count amended complaint alleging that the defendants violated Title VII and that ALPA violated its duty of fair representation under the Railway Labor Act.  United and ALPA filed motions to dismiss, which the Court granted in part and denied in part.  *Oka v. Air Line Pilots Ass'n*, No. 23 C 15793, 2024 WL 3888763 (N.D. Ill. Aug. 20, 2024).  Oka then filed a second amended complaint, and ALPA again filed a motion to dismiss, which the Court granted in part and denied in part.  *Oka v. Air Line Pilots Ass'n*, No. 23 C 15793, 2025 WL 580843 (N.D. Ill. Feb. 23, 2025).

Oka now has three remaining claims, two against United and one against ALPA. First, Oka claims that United violated Title VII by failing to reasonably accommodate his religious objections to the vaccination mandate.  Second, Oka claims that United violated Title VII by providing disparate treatment—namely, worse accommodations—to religious objectors than to medical objectors.  Third, Oka claims that ALPA also violated Title VII by providing disparate treatment to religious and medical objectors.  The Court addresses each in turn.

## Discussion

Summary judgment is appropriate if there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (quoting Fed. R. Civ. P. 56(c)).  In other

---

[2] Oka has filed separate appendices to respond to ALPA's motion and United's motion. To distinguish between the two, the Court refers to them as Oka-ALPA and Oka-United, respectively.

9

words, a court may grant summary judgment if a jury could not reasonably find for the nonmovant based on the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–252 (1986).

The party seeking summary judgment bears the initial burden of showing that there is no genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant must identify "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). "Inferences supported only by speculation or conjecture will not suffice." *Id.*

## A. Failure-to-accommodate claim

"Title VII of the Civil Rights Act of 1964 requires employers to accommodate the religious practice of their employees unless doing so would impose an 'undue hardship on the conduct of the employer's business.'" *Groff v. DeJoy*, 600 U.S. 447, 453–54 (2023) (quoting 42 U.S.C. § 2000e(j)). To bring a failure-to-accommodate claim, an employee must show, as a threshold matter, that: "(1) the observance or practice conflicting with an employment requirement is religious in nature; (2) the employee called the religious observance or practice to [the] employer's attention; and (3) the religious observance or practice was the basis for [the employee's] discharge or other discriminatory treatment." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013) (internal quotation marks omitted). The burden then shifts to the employer to show that it reasonably accommodated the employee's religious belief or practice or could not do so without undue hardship. *Id.*; *see Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68–69 (1986); *Groff*, 600 U.S. at 473.

10

For purposes of summary judgment, United does not challenge Oka's ability to satisfy the threshold showing. United instead asserts that summary judgment is appropriate because (1) it reasonably accommodated Oka's religion, and (2) alternative accommodations would have imposed an undue hardship. The Court agrees with United's second argument, so it need not address the first.

Title VII does not require an employer to provide an accommodation that would impose an undue hardship, *i.e.*, a burden that is "substantial in the overall context of [the] employer's business." *Groff*, 600 U.S. at 468. This inquiry is fact-specific, and a court must consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [the] employer." *Id.* at 470–71 (internal quotation marks omitted). The Seventh Circuit has clarified that an employer must "demonstrate an objective undue hardship on its business, not one just subjectively perceived." *Kluge v. Brownsburg Cmty. Sch. Corp.*, 150 F.4th 792, 808 (7th Cir. 2025).

United states that the spread of COVID caused a drastic decline in air travel and sickness, hospitalization, and even death among its employees. According to United, the resulting financial harm and staffing shortages imposed a significant burden on its business. United argues that the vaccination mandate was necessary to prevent the spread of COVID and that permitting unvaccinated pilots like Oka to continue flying, increasing the risk of infection, would have constituted an undue hardship.

In response, Oka proposes twenty-one ways in which, in his view, United could have permitted him to continue flying unvaccinated without undue hardship. These proposed accommodations largely amount to a contention that United could have

11

permitted Oka to continue to work if he wore a mask, tested for COVID regularly, and avoided contact with others.

This contention is unpersuasive. As United points out, the medical consensus at the time was that vaccination was the most effective way of containing COVID. Masking, testing, and avoiding contact with others—measures of containing COVID prior to the development of the vaccines—were inadequate substitutes. That is reflected in several empirical studies cited by United's expert, Dr. Carlos Del Rio, finding that vaccinated people were less likely to catch COVID than their unvaccinated counterparts. And although vaccination was not 100 percent effective, Del Rio states that when vaccinated people caught COVID (so-called breakthrough infections), they were less likely to spread it to others or suffer from serious illness resulting in hospitalization or death.

Del Rio also highlights several limitations with masking and testing as preventative measures. One limitation of masking is that it is effective only if individuals wear their masks and do so correctly. But, according to Del Rio, "[p]roper mask use is difficult to enforce and usually depends on close observation." United App'x, Ex. 3 ¶ 52. Moreover, Del Rio points out that a workplace mask mandate does nothing to prevent an employee from becoming infected outside of work and then bringing the virus to the workplace.

Turning to testing, Del Rio states that testing is not an effective preventative strategy because it only "identifies those who are already infected." *Id.* ¶ 56. If someone becomes infected between tests, they can unknowingly spread that infection. Testing therefore serves only as a complement to other preventative measures, and its

12

effectiveness depends on how frequently a person tests. Even in conjunction with masking, Del Rio asserts that weekly testing would not be frequent enough to substitute for vaccination. Moreover, Del Rio recalls that the rapid antigen tests available at the time had a false negative rate of around 20%, meaning that in one in five cases a rapid test would fail to detect an infection. He also states that confirming a rapid test result with a more reliable PCR test would take between one and three days to get results back. Del Rio thus concludes that "vaccines are far more effective at reducing community spread than other alternative measures, including masking and testing." *Id.* ¶ 59. Given the severe consequences of further COVID infection, United was not required to accept the risk of using those alternative measures.

Oka cites two scientific studies to contest the effectiveness of vaccination, but neither supports his position. He first quotes a July 30, 2021 statement by the Director of the Center for Disease Control (CDC) summarizing a study's finding that "Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people" and that "vaccinated people infected with Delta can transmit the virus." Pl.'s Resp. to United's Mot. for Summ. J. at 11 (quoting *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, Ctrs. for Disease Control & Prevention (July 30, 2021), https://archive.cdc.gov/www_cdc_gov/media/releases/2021/s0730-mmwr-covid-19.html). Oka also relies on a Lancet Infectious Diseases study of 621 participants that found that "fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in household settings." Pl.'s Resp. to United's Mot. for Summ. J. at 11 (quoting Anika Singanayagam

13

et al., *Community Transmission and Viral Load Kinetics of the SARS-CoV-2 Delta (B.1.617.2) Variant in Vaccinated and Unvaccinated Individuals in the UK: A Prospective, Longitudinal, Cohort Study*, 22 The Lancet Infectious Diseases 183 (2021), https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext).

Those studies at most suggest that vaccination was less effective at mitigating how contagious a person was once already infected with the Delta variant. Put differently, once a breakthrough infection occurred, that infection was highly transmissible. That does not address the benefits of vaccination against other variants that were still circulating at the time. Nor does it undermine the other main benefit of vaccination—preventing infections in the first place.

The study cited by the CDC Director identified this nuance. Though it observed that a majority of the observed infections involved vaccinated people, the study reasoned that may merely reflect that more of the observed population was vaccinated in general: "As population-level vaccination coverage increases, vaccinated persons are likely to represent a larger proportion of COVID-19 cases." Catherine M. Brown et al., *Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings—Barnstable County, Massachusetts, July 2021*, 70 Morbidity & Mortality Weekly Report 1059 (Aug. 6, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w. The study thus cautioned that the "data from this report are insufficient to draw conclusions about the effectiveness of COVID-19 vaccines against SARS-CoV-2, including the Delta variant, during this outbreak." *Id.* Given these limitations, among others, the study emphasized that vaccination continued to be "the most important strategy to prevent

14

severe illness and death." *Id.*

The Lancet study highlights the limitations of using peak viral loads as a proxy for effectiveness. That study, as Oka says, found that peak viral loads were comparable in vaccinated and unvaccinated individuals infected with the Delta variant. But it also found that vaccination was still effective at reducing transmission of the Alpha variant, that vaccination reduced the risk of Delta variant infection, and that infected individuals who were vaccinated were contagious for a shorter period of time. In short, the studies cited by Oka are actually consistent with the consensus that vaccination was the most effective way of preventing COVID from spreading.

Oka next attempts to undermine United's safety justification by pointing to United communications and policies that, in his view, show that United itself viewed vaccination as unnecessary. He first relies on United's pilot bulletin 21-273, which permitted pilots to exercise their discretion whether to wear masks in the cockpit, to suggest that United viewed masking as sufficient. Oka's reliance is misplaced. As United points out, that pilot bulletin was in place during the vaccination mandate, so it authorized masking as a complement to vaccination, not a substitute.[3]

Second, Oka asserts that United "was simultaneously and publicly boasting about its aircraft's safety—telling passengers and the media that its cabins were among the safest indoor spaces—while internally telling employees that the vaccine mandate

---

[3] United likely permitted (vaccinated) pilots to choose whether to wear masks in the cockpit because of its concern that masking could impede communication or the donning of an oxygen mask in emergency situations. Oka quibbles with these concerns, stating in a declaration that he had never encountered communication problems and could don an emergency mask quickly even with a surgical mask. Perhaps, but other pilots may not have been as comfortable, hence United's choice to leave it to pilot discretion.

15

was necessary because they might be a safety risk." Pl.'s Resp. to United's Mot. for Summ. J. at 11. Oka contends that those representations were contradictory, suggesting that United's safety concerns were mere pretext.

The Court disagrees. The public statements that Oka relies upon state that the risk of COVID infection on a flight was close to zero because of the filtration in an airplane cabin. But a flight is not the only time when unvaccinated pilots would present a risk. For example, pilots must walk to and from the airplane, often through a crowded airport. They also spend time with the rest of their flight crew between flights, for example, spending layovers at a Union-approved hotel. United might have viewed its flights as safe and nonetheless been concerned that unvaccinated pilots could spread COVID elsewhere at work.

Perhaps recognizing this, Oka's attests in a declaration that he would have volunteered to find separate transportation and lodging at his own expense and eaten crew meals in a separate chair with a barrier surrounding it. But the risks were not so confined. An unvaccinated pilot, anytime they were in contact with anyone else, presented a heightened risk of infection. Oka does not suggest that he could have avoided contact with everyone else entirely, nor could he. As experience shows, that was simply not feasible.

Third, Oka contends that Scott Kirby, United CEO, revealed in an interview that the real purpose of the vaccination mandate was to advance the Biden Administration's goal of nationwide vaccination. The interview does suggest that Kirby wanted the entire nation to become vaccinated, but that is not inconsistent with a belief that vaccination was necessary to ensure that United employees and customers were safe. The only

16

statement pertaining to that issue is Kirby's statement that "[t]he aircraft itself is safe." Oka-United App'x, Ex. 9. But as discussed earlier, unvaccinated pilots could still pose a significant risk elsewhere in the workplace environment.

Oka proposes another ulterior motive: "[United's] management feared that foreign countries might require vaccinations for flight crews to enter, which would 'drastically cut UAL's international schedule.' . . . The mandate was . . . about protecting international route authority and commercial interests." Pl.'s Resp. to United's Mot. for Summ. J. at 12. But as discussed above, United could have had multiple motivations for imposing the vaccination mandate. But that does not undercut its claim of undue hardship. To the contrary, Oka's argument introduces additional economic reasons why United legitimately could not permit unvaccinated pilots to continue flying.

Fourth, Oka repeatedly references exhibits and testimony in another case that purportedly undermine United's safety justification. Oka did not provide those in connection with his responses to the summary judgment motions in this case, so they are not part of the record and therefore do not help him avoid summary judgment. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014). Even if they were, they would offer him no support. For example, Oka purports to quote Johnson's testimony that testing and masking was a reasonable accommodation, but the Court cannot find anything to that effect in the testimony that Oka cites. *See* Pl.'s Resp. to United's Mot. for Summ. J. at 15 n.16 (citing Redacted Appendix in Support of Plaintiffs' Motion for Class Certification at App'x 796–813, *Sambrano v. United Airlines, Inc.*, 347 F.R.D. 155 (N.D. Tex. 2024) (No. 4:21 C 1074-P)). Oka also cites Johnson's testimony as "directly contradict[ing]" deposition testimony from Kirk Limacher, United's Vice

17

President of Human Resources, where Limacher said that he consulted Johnson because "[United] considered accommodations with a safety lens." Pl.'s Resp. to United's Mot. for Summ. J. at 8; United App'x Ex. 4, 53:25–54:20. But as far as the Court can tell, Johnson's testimony is materially consistent with Limacher's. Johnson testified that she was involved in United's consideration of safety measures such as masking and testing but not in the specific decision to put employees on unpaid leave. Redacted Appendix in Support of Plaintiffs' Motion for Class Certification, *supra*, at App'x 809–11.

Finally, Oka argues that summary judgment is inappropriate because United has produced "no modeling, no quantified projections, no cost analysis, and no operational data" to support its claim of undue hardship. *Id.* at 14. But Oka cites no authority stating that United needed to do so. Nor is there any indication in the text of Title VII or the caselaw suggesting that such quantitative proof is necessary. Rather, to establish that it could not permit Oka to fly unvaccinated, United only needed to show that doing so would impose a burden that was "substantial in the context of [its] business." *Groff*, 600 U.S. at 471. As other courts have found, the increased risk from permitting unvaccinated employees to continue working in person readily qualifies. *See, e.g.*, *Rodrique v. Hearts Commc'ns, Inc.*, 126 F.4th 85, 91–94 (1st Cir. 2025) (holding that a defendant demonstrated undue hardship, and was entitled to summary judgment, based on undisputed evidence that it reasonably relied on objective medical evidence in setting its vaccination policy) *Henry v. S. Ohio Med. Ctr.*, 155 F.4th 620, 632–33 (6th Cir. 2025) ("[I]n determining whether an accommodation would pose an undue hardship, an employer is permitted to draw conclusions based on evidence and information that

18

was available at the time."); *see also, e.g.*, *Petersen v. Snohomish Reg'l Fire & Rescue*, 150 F.4th 1211, 1220 (9th Cir. 2025); *Hall v. Sheppard Pratt Health Sys., Inc.*, 155 F.4th 747, 753–55 (4th Cir. 2025); *Wise v. Child.'s Hosp. Med. Ctr. of Akron*, No. 24-3674, 2025 WL 1392209, at *3–5 (6th Cir. May 14, 2025). United has therefore established that permitting Oka to continue flying unvaccinated, even with his proposed accommodations, would impose an undue hardship. Oka has not produced evidence from which a jury reasonably could find otherwise.

## B. Disparate treatment claims

The Court next considers Oka's disparate treatment claims, first against United, then against ALPA.

### 1. United

Oka claims that United discriminated against him on the basis of religion by (1) imposing the vaccination mandate and (2) providing worse accommodations to religious objectors than to medical objectors.

Before addressing the merits, the Court considers United's contention that Oka has not exhausted the latter claim. "Before bringing a Title VII claim, a plaintiff must first exhaust his administrative remedies by filing charges with the EEOC . . . ." *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019). That requirement is a mandatory claim-processing rule, not a jurisdictional one. *Fort Bend County v. Davis*, 587 U.S. 541, 543–44 (2019). Its purpose is to "give[] the employer some warning of the conduct about which the employee is aggrieved and afford[] the EEOC and the employer an opportunity to attempt conciliation without resort to the courts." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013).

19

The Seventh Circuit has stated that in assessing whether a plaintiff's EEOC charge adequately described the claims raised in a later lawsuit, a court should ask whether the claims are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). That test is satisfied "if there is a reasonable relationship between the allegations in the charge and the claims in the complaint"—at a minimum, describing the same conduct and implicating the same individuals—"and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Id.* at 500–01.

United argues that Oka has not exhausted his disparate treatment claim based on the disparity between medical and religious objectors because it was not mentioned in his EEOC charge. Oka's EEOC charge did, however, complain that religious objectors received unpaid leave with no benefits or flying privileges. Though the charge did not spell it out, those were ways in which he contends the religious accommodations were worse than the medical accommodations.

In the abstract, whether this sufficed for exhaustion may be a close call. In a sense, it alleges the same conduct—the religious accommodation—and implicates the same individual, United. But because it did not make a comparison to the medical accommodations, it is difficult to say whether the EEOC would discover that disparity in the course of investigating the charge. *Cf. id.* at 500 ("The second part of the [exhaustion] test is difficult to apply because it requires speculation as to what the EEOC might or might not discover in the course of an investigation.").

Oka, however, has produced evidence of what appear to be an EEOC

20

interviewer's notes from talking to Oka about his charge against United.  Those notes state that Oka "claimed that United treated people different[ly] when you filed a religious exemption rather than a medical exemption" and that "medical exemptions were allowed to still use there [sic] benefits."  Oka-United App'x, Ex. 2.  In other words, the evidence shows that the EEOC in fact discovered the alleged disparity in accommodations.  United has not challenged the authenticity of this evidence.  With the purposes of the exhaustion requirement in mind, the Court concludes that Oka has met *Cheek*'s test and that he exhausted his disparate treatment claim against United.

With that established, the Court turns to the merits of Oka's claims.  To establish a disparate treatment claim under Title VII, a plaintiff must show that discriminatory motive or intent caused an adverse employment action.  *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012); *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 573 (7th Cir. 2021).  A plaintiff may do so by presenting evidence that, when viewed as a whole, shows discriminatory intent.  *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

A plaintiff may also organize the evidence through the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, a plaintiff must first show that he is a member of a protected class, he was meeting the defendant's legitimate expectations, he suffered an adverse employment action, and similarly situated employees who were not members of his protected class were treated more favorably.  *Khungar*, 985 F.3d at 573.  If the plaintiff makes that showing, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse action.  *Id.*  The plaintiff then bears the final burden of producing

21

evidence that the proffered reason is a pretext for discrimination. *Id.*

Regardless of how a plaintiff presents a disparate treatment claim, the ultimate question at summary judgment is whether the evidence viewed as a whole permits a reasonable inference that discriminatory intent caused the challenged conduct. *See id.* at 574. Here, that ultimately boils down to whether Oka can show pretext. To survive summary judgment, Oka must show "a genuine issue about the honesty, not the accuracy," of United's proffered justifications. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014). United asserts that its decision to impose the vaccination mandate was motivated by safety, a legitimate, non-discriminatory reason. As discussed earlier, Oka's attempts to undermine that explanation are unavailing. No jury reasonably could find based on the evidence that United's safety concerns in imposing the vaccination mandate were a mere pretext for discrimination.

That leaves Oka's argument that United discriminated against him by offering worse accommodations to religious objectors compared to medical objectors. According to United, the difference between the accommodations derived from differences between personal leave and medical leave set out in the UPA. Oka does not dispute that compliance with a collective bargaining agreement, like the UPA, is a legitimate, non-discriminatory policy.[4] *See Winfrey v. City of Chicago*, 259 F.3d 610, 618 (7th Cir. 2001).

Instead, Oka primarily challenges that explanation by arguing that United's accommodation terms were inconsistent with the UPA. First, he contends that the UPA did not authorize United to place him on a forced, unpaid leave. The relevant provision,

---

[4] Oka does not claim that the UPA's terms were a form of discrimination.

section 12-A-1, states in relevant part that "a Pilot may be granted a personal leave of absence up to a maximum of five (5) years for any reason deemed adequate by the Company." United App'x, Ex. 8 § 12-A-1.

The Court does not see how that language supports Oka's position. In context, the phrase "may be granted" merely establishes that *United* has discretion whether to grant personal leave. Perhaps Oka's contention is that the word "granted" implies an initial request, but he *did* make such a request by applying for a religious accommodation that he knew amounted to personal leave. To be sure, Oka disputes whether United appropriately could offer personal leave as his accommodation, but that goes to his failure-to-accommodate claim, not the relevant question here of whether United complied with the UPA. It is also not clear that the word "granted" in UPA section 12 impliedly prohibits United from placing a pilot on leave in appropriate circumstances, especially because section 12 is not clearly a restriction on United's authority in the first place. United's rejection of that reading is not so obviously wrong to suggest that a reasonable jury could find it was not honestly attempting to structure its accommodations according to the UPA. In any event, United imposed leave on religious and medical objectors alike. As a result, even if that decision was inconsistent with the UPA, that would do little to advance Oka's claim that United treated the two groups differently.

Next, Oka asserts that United deviated from the UPA by permitting medically exempt pilots to use sick leave when they were not actually sick. This argument is rooted in UPA section 13-A-5, which states that "[s]ick leave with pay shall be granted only in cases of actual sickness." *Id.* § 13-A-5 The rest of section 13-A-5, however,

23

permits a pilot to use sick leave for dental or doctor appointments if his dentist or doctor does not have availability outside of scheduled work hours.  Other provisions of the UPA similarly suggest that actual sickness was not always required.  Section 12-F-4, for example, permits pregnant pilots to exhaust paid sick leave prior to taking a parental leave of absence.  And agreements between United and ALPA outside of the UPA further suggest that United's sick-leave practice was not as constrained as Oka asserts. For example, Letter of Agreement 16-01 uses sick leave to handle instances of pilot fatigue.

United, like ALPA, reads these provisions as a whole to permit sick leave if an employee is unavailable to "work for a medical reason, sometimes even if a pilot is not actually ill."  *See* ALPA Stat. of Facts ¶ 12; United's Reply in Supp. of Mot. for Summ. J. at 15.  That reading is arguably difficult to square with the language of section 13-A-5, but it is important to recognize that the UPA was not crafted with COVID in mind.  An honest attempt by United to adhere to the UPA in addressing the unique problems of COVID may nonetheless have led to some arguable inconsistencies of the kind that Oka points out.  But viewed in context, United's interpretation is not so implausible to give rise to a reasonable inference of pretext.

Perhaps recognizing that he needs something more, Oka argues that United's current interpretation is a litigation invention at odds with its previous positions in response to two grievances.  One is a grievance denial where Bryan Quigley, United's Senior Vice President of Flight Operations, asserted that vaccination was not a "flight qualification."  Oka-United App'x, Ex. 12.  But in context, Bryan Quigley's point was that the vaccination requirement was not a limitation on flying specifically, but rather a

24

requirement to work at United, full stop. Properly understood, there is no contradiction. Under Quigley's view and United's position now, an unvaccinated pilot could not fly or otherwise work for United. If he could not be vaccinated because of a medical condition, then he would be unavailable to work for a medical reason.

Oka also alludes to an instance where United denied long-term disability status to medically exempt pilots because they held valid Federal Aviation Act (FAA) First-Class medical certificates. That, according to Oka, concedes that medically exempt pilots were medically able to fly. Oka, however, does not provide any citation to the record for this purported grievance or response and thus forfeits the point. In any event, Oka conflates different standards. A pilot may qualify for sick leave without qualifying for long-term disability or losing their FAA medical certificate, which relates to general fitness to fly rather than temporary sickness, *see generally Guide for Aviation Medical Examiners*, Fed. Aviation Admin. (Mar. 8, 2023), https://www.faa.gov/ame_guide/standards. That is true under United's interpretation: for example, a pilot may be unable to work due to a medical condition that is too temporary to qualify as a long-term disability.

In short, Oka's contention that United deviated from the UPA would not permit a reasonable inference that United's explanation is a pretext for discrimination.

Oka advances two other arguments. First, he suggests that United could have negotiated new leave provisions. United, however, responds that it did not have time to do so before implementing its vaccination mandate, which it viewed as urgent because of the rapid rise of the Delta variant. Oka notes that United could have negotiated new leaves in May 2021, when it first considered a vaccination mandate. That might have

been prudent, but United's failure to do so does not permit a reasonable inference of discriminatory intent. Oka also asserts that the 48-hour negotiation of MOU 20-01 shows that United was capable of moving quickly, but as United points out, MOU 20-01 did not require renegotiating the UPA's preexisting leave structure.

Finally, Oka tries to get at discriminatory intent more directly by asserting that United was "guided by an executive openly hostile to religious exemptions." Pl.'s Resp. to United's Mot. for Summ. J. at 20. The only admissible basis for that assertion, however, involves the previously discussed comments by Kirby generally expressing approval of vaccination. But that does not reasonably imply animus against religious objectors. Oka also states that United intentionally created a sham process, but his proof falls flat there too. He relies solely on his own declaration, quoting the following statement by Nau:

> [Regarding] requesting accommodations for COVID-19, we modified our process a little bit and made it automated. . . . So it went from a very personal one-on-one conversation, same amount of documentation, same process, but now it was definitely more employee driven. Like a lot less handling . . . [regarding] the return to work[] and pilots. That was on a personal level. We followed up with a number of pilots a couple of times that hadn't either responded or sort of responded no, making sure that they were aware that they had the opportunity to come back . . . . So we did—on an individual basis, I believe our chief pilots sort of divided and [conquered] the group that were on leaves of absence to ensure that these individuals knew their rights to return if they hadn't communicated back to the Company.

But this statement does not distinguish between religious and medical accommodations. In fact, it says almost nothing about United's motives. United could have cut down on the accommodations process for a number of other nondiscriminatory reasons, such as a desire to minimize logistical burdens. To infer from Nau's statement discrimination against religious objectors specifically

26

would be pure speculation.  That is not enough to avoid summary judgment.

In sum, Oka's arguments do not permit a reasonable inference that United offered different accommodations to religious and medical objectors due to discriminatory intent.

### 2.     ALPA

In his final claim—his disparate treatment claim against ALPA—Oka asserts that ALPA discriminated against him by permitting the disparity in the religious and medical accommodations that United offered.

Section 703(c) of Title VII forbids a union from discriminating against any individual because of his religion and from causing an employer to discriminate unlawfully.  42 U.S.C. § 2000e-2(c).  A union is liable under this section, however, only if it "discriminates in the performance of its agency function," *i.e.*, its role "as the employees' agent (in bargaining and in implementing contracts)."  *Maalik v. Int'l Union of Elevator Constructors, Local 2*, 437 F.3d 650, 652 (7th Cir. 2006) (quoting *EEOC v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 660 (7th Cir. 2003)).  Moreover, a union does not have an affirmative duty to investigate and rectify discrimination in the workplace.  *Pipefitters*, 334 F.3d at 659–61.  A union may, however, be liable for certain forms of selective inaction, for example, if it refuses to press a black worker's grievance but would do so if he were white.  *Id.* at 661.

At the outset, ALPA argues that Oka must make a threshold showing that he complained to ALPA about the disparity in accommodations.  The Court does not agree. Nothing in section 703(c) imposes such a requirement.  To be sure, a plaintiff must complain to a union as a prerequisite to a suit against the union for breach of its duty of

fair representation.  *Mechmet v. Four Seasons Hotel, Ltd.*, 825 F.2d 1173, 1178 (7th Cir. 1987).  After all, "if a worker doesn't even ask his union to press a grievance for him he can hardly complain that it has failed to represent him."  *Id.*  The Seventh Circuit, however, has made clear that liability under section 703(c) of Title VII does not turn on the existence or breach of such a duty.  *Green v. Am. Fed'n of Tchrs.*, 740 F.3d 1104, 1105–07 (7th Cir. 2014).  Whether Oka complained to ALPA is still relevant, for example, regarding whether he can show that ALPA's failure to pursue his claim was discriminatory.  But a failure to complain is not an automatic basis for summary judgment.

Turning to the merits of Oka's claim, he argues that ALPA discriminated against religious objectors by failing to challenge the disparity in medical and religious accommodations.  ALPA responds that its role was limited to ensuring that United adhered to the UPA and preexisting practices.  According to ALPA, it did not challenge the difference in accommodations because it viewed them as consistent with the UPA's provisions for personal and medical leave.  ALPA did not have an affirmative duty to challenge the disparity.  ALPA's justification is also a legitimate, non-discriminatory explanation.  Thus to survive summary judgment, Oka must show that a jury reasonably could find that ALPA's inaction was selective and, relatedly, that its policy of intervening only to enforce the UPA was pretextual.

Oka attempts to do so in four ways.  First, he argues that ALPA took active steps to worsen United's religious accommodation.  Specifically, Oka points out that Hunnewell prompted Nau in their email conversation to change the maximum personal leave duration from six years to five and to prevent religious pilots from having the

28

unilateral right to return early in the event of a furlough. But ALPA states that Hunnewell's proposed changes resolved conflicts with the UPA, and Oka does not contend otherwise.

Second, Oka contends that ALPA went beyond ensuring compliance with the UPA when Hunnewell suggested to Nau that pilots with medical accommodations should be able to use sick leave. In Oka's view, that was not required by the UPA and even contradicted UPA section 13-A-5's actual sickness requirement. The latter point, as discussed earlier, is unavailing. Oka points out that, unlike United, ALPA itself took the position in a later arbitration that sick leave was appropriate only in cases of actual sickness. It did so, however, to argue that United should have provided pay protection instead of *forcing* pilots to use sick leave, an argument that the System Board rejected. The question of whether Section 13-A-5 prohibits United from *permitting* use of sick leave in cases not involving actual sickness is different.

Regarding whether Hunnewell's suggestion went beyond what was required by the UPA, the text of his email suggests that disallowing sick leave may have constituted a departure from previous practice: "[F]or the medical RAPs it seems odd to put a pilot on medical leave while he still has sick bank. I'm not aware of that ever happening before." ALPA App'x at 900. Eisenberg's follow-up email to confirm ALPA's position on the issue expressly stated that ALPA's role was limited to ensuring compliance with the UPA, and it approached the issue accordingly, stating only that ALPA agreed that permitting sick leave would be consistent with the UPA and previous practices.

Taking a step back, to the extent that Hunnewell's email may have stepped beyond that role, it appears to have been a one-off. ALPA's communications to its

29

members and to United were otherwise consistently in line with its position now that its only role regarding accommodations was to align them with the UPA. Oka's burden is to produce evidence from which a jury reasonably could find that ALPA's explanation is dishonest, not merely that it did not adhere to it perfectly. Hunnewell's single email suggestion that only arguably stepped beyond ALPA's compliance role does not get Oka there.

Third, Oka argues that ALPA did not ensure compliance with the UPA because it did not challenge United's decision to implement the vaccination mandate without negotiating with ALPA first. According to Oka, that violated UPA section 21-k. This argument lacks merit. Section 21-k states in relevant part: "Company personnel policy which affects pilots shall not be changed without giving advance notice to the Association and affording them the opportunity to comment." *Id.* at 338. As the System Board and GRP recognized, that simply required United to provide advance notice and an opportunity to comment, not to negotiate the vaccination mandate with ALPA.

Fourth, Oka produces evidence of statements by ALPA members that, in his view, establish animus against religious objectors. He asserts that "ALPA leadership derided religious objectors, mocked them in private text messages, and compared their principled stand to those invoking the Nuremberg defense." Pl.'s Resp. to ALPA's Mot. for Summ. J. at 1. That assertion, however, largely mischaracterizes the evidence. For example, the Nuremberg comparison was made by a religious objector who cited the Nuremberg Code as a basis for his objection to the vaccination mandate in an email to MEC Chair Insler. Insler found the comparison highly offensive.

Some cited conversations contain no signs of animus, such as the following

30

conversation about United's religious accommodation page between Daniel Fandrei (presumably another ALPA member) and Hunnewell:

> Fandrei:  This says 72 months
>
> Hunnewell:  Maybe that's right I didn't look out [sic] up
>
> Fandrei:  It's 60 months
>
> Hunnewell:  Oh dear
>
> Fandrei:  [Quoting the UPA personal leave provision]

Oka-ALPA App'x, Ex. 1.  Others might be fairly characterized as derisive but do not display animus toward religious objectors.  For example, Hunnewell extensively criticizes a court opinion related to United's COVID protocols in one conversation, but his critiques are largely legal in nature, and none provide a basis to reasonably infer animus toward religious objectors.

Oka's strongest evidence is a text message from Insler reacting to an article about a religious objector, where he stated:  "I like how people pick and choose their religious watermarks."  *Id.*  But stray remarks, even if discriminatory, are insufficient to defeat summary judgment if they are not related to the challenged decision.  *Hong v. Child.'s Mem. Hosp.*, 993 F.2d 1257, 1266 (7th Cir. 1993); *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997).  Here, Oka can point to no connection between that comment and any decision by ALPA not to press a grievance regarding the disparity in religious and medical accommodations.  Insler attests that he was not involved in any such decision, and Oka does not dispute that representation.[5]  From the

---

[5] UPA Section 17-A-7 seems to authorize the MEC Chairman to initiate review of "an alleged misapplication or misrepresentation" of the UPA.  ALPA App'x at 248.  It is conceivable that Insler did not exercise this authority to raise the issue of the different

31

record, the only decision-makers who considered a grievance regarding the accommodations were Di Costanzo and Pedata, and none of the admissible evidence supports a reasonable inference of animus on their part, let alone animus connected to their decision.

In sum, a jury could not reasonably find in Oka's favor based on the arguments and the evidence in the record.

### Conclusion

For the above reasons, the Court grants United's motion for summary judgment [dkt. 137] and ALPA's motion for summary judgment [dkt. 127]. The Court directs the Clerk to enter judgment stating: Plaintiff's claims are dismissed with prejudice. The trial date and all other dates and deadlines are vacated.

Date: March 24, 2026

_____
MATTHEW F. KENNELLY
United States District Judge

---

accommodations because of bias against religious objectors. But Oka does not brief this issue. And in any event, he has not presented sufficient evidence in the record to support this theory.